# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

OLEAN WHOLESALE GROCERY
COOPERATIVE, INC.,

                Plaintiff,

    v.

CARGILL, INC., CARGILL MEAT
SOLUTIONS CORPORATION, JBS
USA FOOD COMPANY HOLDINGS,
J.B.S. S.A., JBS PACKERLAND, INC.,
NATIONAL BEEF PACKING
COMPANY, TYSON FOODS, INC., and
TYSON FRESH MEATS, INC.,

                Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Olean Wholesale Grocery Cooperative, Inc. ("Olean" or "Plaintiff") hereby brings this antitrust class action lawsuit, on behalf of itself and all persons and entities similarly situated, against Defendants Cargill, Inc. and Cargill Meat Solutions Corporations (a/k/a/ Cargill Protein), JBS S.A., JBS USA Food Company Holdings, JBS Packerland, Inc., National Beef Packing Company, Swift Beef Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc., and unnamed co-conspirators, alleging as follows:

## I.    NATURE OF THE ACTION

1.    This action is brought on behalf of Olean and all persons and entities who purchased beef in the United States directly from one or more Defendants from at least January 1, 2015, until the present (the putative "DPP Class" or "Class"). Olean alleges that Defendants violated Section 1 of the Sherman Act by conspiring to constrain beef supplies in the United States and thereby artificially inflate domestic beef prices to direct purchasers. As a direct result of Defendants' unlawful conduct, Olean and the other members of the DPP Class suffered antitrust injury, for which the Plaintiff seeks treble damages, injunctive relief, and demands a trial by jury of the claims asserted in this Complaint.

2.    Defendants are the world's largest meat processing and packing companies. Together they sold approximately 80% of the more than 25 million pounds of fresh and frozen "boxed" and "case-ready" beef (collectively, "beef") supplied to the United States beef market in 2018.

3.    Since at least the start of 2015, Defendants have exploited their market power in this highly concentrated market by operating an illegal conspiracy to limit the

1

supply of, and fix the price of, beef sold to Olean and others in the U.S. wholesale market (the "Conspiracy"). The principal, but not exclusive, means Defendants use to effectuate the Conspiracy is a concerted scheme to artificially constrain the supply of beef entering the domestic supply chain. Defendants' collusive restriction of beef supply has had the intended effect of artificially inflating beef prices to supra-competitive levels. As a result, Olean and others who purchase beef directly from Defendants have paid higher prices than they would have paid in a competitive market.

4.      The existence of the Defendants' conspiracy is confirmed by at least one confidential witness account. A confidential witness previously employed by a Packing Defendant ("Witness 1"), has confirmed that each of the Defendants expressly agreed to reduce their respective purchase and slaughter volumes, which would have the effect of artificially raising the price of Beef sold to direct purchasers. Witness 1's account is corroborated by transactional data and slaughter volume records reported by Defendants and published by the United States Department of Agriculture ("USDA"), as well as Defendants' public calls for industry-wide slaughter and capacity reductions.

5.      In addition to the high concentration in the wholesale beef market and the confidential witness statements concerning Defendants' coordination, the structure of the beef industry also facilitates the Conspiracy. Defendants sit atop the supply and distribution chain that ultimately delivers beef to the market. Their vital role is to purchase cattle (known in the industry as "fed cattle") from the nation's farmers and ranchers, process and pack it into edible beef, and sell the beef to Olean and other direct purchasers.

Defendants' gatekeeping role has enabled them to collusively control both upstream and downstream pricing throughout the Class Period.

6.    Capitalizing on the fundamental market mechanism of supply and demand, Defendants have collaborated to reduce beef supplies by tactics including, but not limited to, purchasing fewer cattle than a competitive market would otherwise demand or running their processing plants at less than available capacity. These practices have the concomitant effects of surpluses in the cattle market and shortages in the wholesale beef market. These artificially created conditions, in turn, both drive down the prices Defendants pay for cattle and boost the prices they command for beef. The result is to swell Defendants' profit margin (or "meat margin").

7.    This growth of Defendants' margins is aided by the particular way supply and demand operate in the beef industry. The supply of cattle is insensitive to short-term price changes because of the long-life cycle of livestock, their perishable nature, and the lack of any alternative use. In turn, beef demand is also relatively insensitive to price fluctuations. As a result, Defendants' margins are very responsive to changes in the aggregate volume of cattle slaughter.

8.    Other market characteristics in the sale of beef serve as "plus factors" supporting the inference of collusion among Defendants during the Class Period. These plus factors include the extreme market concentration already discussed, high barriers to entry, inelastic demand, and the commodity nature of beef. Collectively, these economic factors encouraged the formation of the Conspiracy and continue to foster its successful operation.

3

9.      Another form of interaction conducive to Defendants' collusion are frequent meetings between each other's executives and other key employees. Trade association conferences and other industry events offer convenient opportunities to exchange information, plans and strategies, and build relationships. As described in more detail throughout this Complaint, Defendants took advantage of these opportunities to further their collusive supply restrictions.

10.     Defendants began exploiting these favorable market conditions to launch the Conspiracy by the start of 2015. At that time, they undertook a campaign of throttling the beef supply that has endured to the present. Defendants' abrupt transition from competition to collusion is vividly documented by publicly available industry data.

11.     One source of evidence is the beef sales volume of Defendants. An example is data comparing the average annual beef cattle slaughter by each Defendant before the Class Period (from 2007 through 2014) to the same average during the first three years of the Class Period (from 2015 through 2017). The data shows that all Defendants curtailed their annual slaughter volumes during the Class Period, while smaller beef, non-defendant, processors *increased* their slaughter volumes during the same period.

12.     As an immediate consequence of this reduced supply, the beef market experienced a dramatic change of price behavior, another symptom of the Conspiracy. Before 2015, the prices of cattle and beef predictably moved in tandem. That correlation reflects the natural economic relationship in a competitive market because beef is simply the product of cattle.

13.     At the start of the Class Period, when Defendants collusively cut production, however, this fundamental economic relationship between cattle and Beef prices was altered. Suddenly, the degree of correlation of cattle and Beef prices diverged to the benefit of the Defendants, and without credible explanation. The relevant supply and demand factors in the industry no longer explained the prices being seen by direct purchasers. Instead, wholesale Beef prices showed unusual trends starting in 2015. The per pound price of cattle had historically stayed within 20 to 40 cents of the per pound wholesale price of Beef on average, but in 2015, the spread between those prices increased dramatically, as seen on the chart below.



| YEARS | FARM-TO-WHOLESALE PRICE SPREAD | PROPORTIONAL INCREASE |
|---|---|---|
| 2010 through 2014 | $34 | --- |
| 2015 through 2018 | $54 | 59% |
| January 2019 | $69 | 27% |

14.    Defendants' ability to cut beef production while maintaining beef prices at an inflated level during the Class Period is strong circumstantial evidence of the Conspiracy. In a market free of collusion, when a competitor reduces its purchase of cattle, other competitors quickly pick up the slack to boost their sales and increase

6

their market shares. In that environment, then, competitors do not cut their purchases with any hope of gaining sales volume or increasing profit margin. Only colluding beef processors would expect to benefit by reducing their purchases and slaughter of cattle. By coordinating their supply output, Defendants have been able to expand their profit margins, confident that none of them would grab volume surrendered by another.

15.     United by the Conspiracy, each Defendant was confident that the others would not break rank by expanding their beef production to satisfy unmet demand. Armed with that assurance, Defendants steadfastly improved their profitability by achieving and sustaining an unprecedented gap between wholesale beef prices and fed cattle prices.

16.     The Conspiracy, aided by Defendants' market power in both the upstream and downstream markets, allowed Defendants to steadily enlarge their operating margins. By the end of 2018, the two publicly traded Defendants, Tyson and JBS, were reporting record margins in their beef business. Tyson reported an operating margin of nearly 7%, almost double its 2014 operating margin; JBS reported beef business margins of 10.2%. Given these swollen margins, it is no surprise that a leading industry reporter remarked that Defendants "no longer compete against each other," enabling them to reap "gangbuster profits."[1]

---

[1] Cassandra Fish, "Whatever Happened to a Fair Fight," The beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/

17.    In summary, Defendants have illegally colluded during the Class Period to raise and fix beef prices at levels higher than those that would have prevailed in a competitive market. As a direct result, Olean and the other members of the Class have suffered antitrust injury by paying artificially inflated prices for beef they purchased from Defendants.

## II.    JURISDICTION AND VENUE

18.    Olean brings this action on behalf of itself and all similarly situated persons and entities under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief and damages in excess of $5,000,000 for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

19.    This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

21.    Venue is also appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants reside in, are found in, or have an agent or transacted business in this District, and because a substantial portion of the affected interstate commerce was carried out in this District.

22.    This Court has personal jurisdiction over each Defendant because, among other reasons, each Defendant has (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial

8

quantities of beef throughout the United States, including in this District; (c) had

substantial contacts with the United States, including in this District; and/or (d) engaged in

an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended

effect of causing injury to the business or property of persons residing in, located in, or

doing business throughout the United States, including in this District.

23.    The activities of Defendants and all co-conspirators alleged in this

Complaint were within the flow of, were intended to, and had direct, substantial, and

reasonably foreseeable effects on, the foreign and interstate commerce of the United

States.

## III.    PARTIES

### A.    Plaintiff

24.    Olean Wholesale Grocery Cooperative, Inc. is a New York domestic

cooperative corporation with its principal place of business at 1587 Haskell Road, Olean,

New York, 14760. Olean directly purchased beef that was processed and sold at

artificially inflated prices by one or more Defendants or their co-conspirators during the

Class Period. Olean has therefore suffered antitrust injury as a direct result of the antitrust

violations alleged in this Complaint.

### B.    Defendants

#### The Cargill Defendants

25.    Cargill, Incorporated ("Cargill") is a privately held Delaware corporation

with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391.

During the Class Period, Cargill and/or its predecessors, wholly owned or controlled

subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Cargill, Incorporated is the parent company of the Cargill group.

26.    Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("Cargill Meat"), a subsidiary of Cargill, is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202. Cargill Meat is the principal operating entity within Cargill's U.S. cattle and beef business and a wholly owned subsidiary of Cargill. On information and belief, Cargill Meat owns directly, or indirectly through its subsidiaries, Cargill's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

27.    During the Class Period, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the Conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the Class in the United States and in this District.

28.    Defendants Cargill and Cargill Meat are referred to collectively as "Cargill."

**The JBS Defendants**

29.    Defendant JBS S.A. is a Brazilian corporation with its principal place of business located at Av. Marginal Direta do Tiete, 500 Bloco 3-30 andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. JBS S.A. is the parent company of the JBS group.

30.    JBS USA Food Company Holdings ("JBS USA") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. JBS USA is the principal operating entity of JBS's U.S. cattle/beef business. On

10

information and belief, it is the principal operating entity within JBS's U.S. cattle and beef business, and the contracting entity for certain of JBS's purchases of fed cattle in the USA.

31.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. Swift owns directly, or indirectly through its subsidiaries, certain of JBS's U.S. fed cattle slaughter plants including the Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and Hyrum, Utah plants.

32.     Defendant JBS Packerland, Inc. ("JBS Packerland") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. On information and belief JBS Packerland owns directly, or indirectly through its subsidiaries, certain of JBS's U.S. fed and dairy cattle slaughter plants,  including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan; the Sun Land beef plant in Tolleson, Arizona; and the Moyer Packing plant in Souderton, Pennsylvania.

33.     Defendants JBS USA, Swift, and JBS Packerland were, throughout the Class Period, wholly owned, direct or indirect subsidiaries of JBS S.A.

34.     Defendants JBS S.A., JBS USA, Swift, and JBS Packerland are referred to collectively herein as "JBS."

35.     During the Class Period, JBS and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

11

36.     During the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the Conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the Class in the United States and in this District.

**The Tyson Defendants**

37.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

38.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh Meats is a Delaware corporation with its principal place of business located at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh Meats is the principal operating entity within Tyson's U.S. cattle and beef business. On information and belief, Tyson Fresh Meats owns directly, or indirectly through its subsidiaries, Tyson's U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

39.     During the Class Period, the Tyson Defendants shared a unity of corporate

40.     interest and operated as part of a single enterprise in furtherance of the Conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the Class in the United States and in this District.

41.     Defendants Tyson Foods and Tyson Fresh Meats are referred to collectively herein as "Tyson."

**The National Beef Defendants**

42.     National Beef Packing Company ("National Beef") is a privately-owned Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

43.     "Defendant" or "Defendants" includes all of the named Defendants' predecessors, including beef meatpackers merged with or acquired by any Defendant and each named Defendant's wholly owned or controlled subsidiaries or affiliates that sold beef in interstate commerce directly to purchasers in the United States during the Class Period.

44.     Defendants sold or distributed beef to direct purchasers or played a material role in the coordinated and collusive behavior alleged. All such entities were active, knowing participants in the Conspiracy alleged, and their conduct was known to and approved by their respective corporate parent named as a Defendant.

**C.     Co-Conspirators**

45.     Various other unknown persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts

and made statements in furtherance of the Conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators, whether named as Defendants or not.

### D.    Reciprocal Agency of Defendants and Co-Conspirators

46.    Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

47.    Each Defendant and co-conspirator acted as the agent or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged by Plaintiff.

### E.    Common Corporate Interest of Each Defendant's Related Entities.

#### The Cargill Defendants

48.    Cargill does not own and operate subsidiaries to diversify risk and earn profits by investing in them. Instead, Cargill has formed subsidiaries to conduct business that Cargill otherwise would have conducted on its own. In particular, Cargill created Cargill Meat to conduct business in the meat industry that Cargill previously operated itself.

49.    Cargill presents itself and its subsidiaries to the public as a single unified enterprise. On its website, for example, Cargill reports that it currently employs 143,000 workers operating in 67 countries. Plaintiff is informed and believes that these numbers include the employees and operations of Cargill Meat. Cargill has also publicly announced consolidated revenues, earnings and cash flow that Plaintiff is informed and believes include performance results from Cargill Meat's beef operations.

14

50.     Further evidencing the symbiotic relationship of Cargill and Cargill Meat is the unified system that processes purchase orders for both companies. Similarly, Cargill operates other business services, including information technology, human resources, finance, transportation and logistics, and procurement, with and for Cargill Meat.

51.     Cargill plays an active role in managing Cargill Meat's business operations. As one example, Cargill's website has reported that its Chairman and CEO, David MacLennan, "supervised several businesses in Cargill Protein," which, on information and belief, subsumes Cargill Meat. As another, Cargill has described the responsibilities of a fellow member of its executive team, Brian Sikes, to include "leading Cargill's global protein and salt businesses," overseeing "Cargill's protein business in North America and Europe" and leading "the transformation of the North American protein business." Again, Plaintiff is informed and believes that Cargill's protein business includes the operations of Cargill Meat.

52.     This extensive involvement in Cargill Meat's management and operations demonstrate that Cargill does far more than provide long-term strategy guidance to Cargill Meat. To the contrary, Cargill Meat was created as an instrumentality of Cargill with the sole purpose of executing Cargill's directives. Throughout the Class Period, Cargill has exerted, and has had the right to exert, control over Cargill Meat.

**The JBS Defendants**

53.     JBS S.A. established subsidiaries, including JBS USA, Swift, and JBS Packerland, to conduct its business, including the purchase and processing of cattle, and the sale of beef. Had JBS S.A. not created or acquired these subsidiaries, it would have

15

performed these functions itself. JBS S.A. is not merely a holding company whose business is restricted to investments in operating subsidiaries.

54.     JBS presents itself as a unified enterprise and conducts consolidated earnings calls on which JBS's corporate representatives discuss the operations and profits of JBS S.A., including JBS USA. On these calls, JBS S.A. executives have described the beef business it conducts through JBS USA, which it refers to as "JBS beef," as a "division" or "business unit."  In addition, JBS S.A. commonly refers to JBS USA as its "JBS USA beef business[.]"

55.     JBS S.A. appointed JBS USA's current CEO, Andre Nogueira, who "report[s] directly" to JBS Global Operations' CEO. In his online "Welcome" message, Mr. Noguiera explains that JBS USA operates "[i]n partnership with JBS S.A."

56.     Defendants Swift and JBS Packerland have been fully integrated into the JBS USA enterprise, resting under the complete control of JBS USA, and in turn, JBS S.A. JBS USA directs and oversees all of JBS's U.S. cattle procurement, beef processing and sales operations, with ultimate direction from JBS S.A.

57.     As these facts demonstrate, JBS S.A does more than provide long-term strategy guidance to JBS USA, Swift, and JBS Packerland. The entire purpose of these subsidiaries is to serve as instrumentalities by executing JBS S.A.'s directives within the greater JBS enterprise. JBS USA, Swift, and JBS Packerland operate independently only to the extent that JBS S.A. permits. Throughout the Class Period, JBS S.A. has exerted, and has had the right to exert, total control over JBS USA, Swift, and JBS Packerland.

16

## The Tyson Defendants

58.     Tyson Foods is not a mere holding company whose business is restricted to investments in operating subsidiaries. Instead, Tyson Foods formed subsidiaries to act as its agents and representatives to conduct business activities that Tyson Foods would otherwise conduct. In particular, with respect to Tyson Foods' Tyson Fresh Meats subsidiary, those activities include purchasing and processing cattle, and selling beef.

59.     Tyson Foods holds itself out to the public as a single unified enterprise, describing the beef business it conducts through Tyson Fresh Meats as a mere "business unit." Tyson Foods has also represented that its current CEO, Noel White, has previously worked for the company, even though he was previously employed only as one of Tyson Fresh Meats' senior group vice presidents.

60.     On its quarterly earnings calls, Tyson Foods' corporate representatives include Tyson Fresh Meats in discussing the company's financial performance. On these calls, Tyson Foods has announced operating income and returns on sales from its beef segment business, which Tyson Fresh Meats operates. More specifically, on these calls Tyson Foods has attributed improved returns to actions taken at plants that Tyson Fresh Meats purportedly owns and operates.

61.     In particular, Tyson Foods has described, on other earnings calls, actions taken by Tyson Fresh Meats to further the Conspiracy. For example, on its August 3, 2015 earnings call, Tyson Foods explained its strategy for cattle purchasing, implemented by Tyson Fresh Meats, in these words: "we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants

17

resulting in inefficiencies and added costs." Similarly, on its May 7, 2018 earnings call, Tyson Foods told investors this about beef production plants owned and operated by Tyson Fresh Meats: "we have to stop production, we have closed plants, several times in the quarter, not every plant, but several plants in the quarter."

62.    Further manifesting their close relationship, Tyson Foods and Tyson Fresh Meats guarantee each other's debts. Tyson Fresh Meats has issued multiple debt securities guaranteed by Tyson Foods. In a registration statement filed with the SEC in 2009, Tyson Foods notified investors that Tyson Fresh Meats pledged not only its own assets to guarantee debt instruments but also those of Tyson Foods and certain "other domestic operation subsidiaries of Tyson [Foods]."

63.    Similarly, in a prospectus filed with the SEC in 2014, Tyson Foods stated that Tyson Fresh Meats would act as a guarantor to Tyson Foods' debt securities, including debentures, notes, and all other types of debt. Tyson Foods has issued multiple Senior Notes pursuant to this arrangement, many of which do not mature until 2034 and some of which do not mature until 2044. Some of these debt instruments have been called before their maturity date.

64.    Furthermore, in their registrations with the USDA's Food Safety Inspection Service, Tyson Fresh Meats' slaughter plants in Dakota City, Nebraska, Lexington, Nebraska, Amarillo, Texas, and Wallula, Washington have each identified Tyson Foods, Inc. as a dba.

65.    As a result, Tyson Foods does not merely provide long-term strategy guidance to Tyson Fresh Meats. Instead, Tyson Fresh Meats' entire purpose is to execute

Tyson Foods's directives within the greater Tyson enterprise and to serve as an instrumentality of Tyson Foods. Tyson Fresh Meats is only "independent" to the extent Tyson Foods permits. Tyson Foods has exerted, and has had the right to exert, control over Tyson Fresh Meats during the Class Period.

## IV. THE STRUCTURE OF THE BEEF INDUSTRY IS HIGHLY CONDUCIVE TO COLLUSION.

### A. The Journey of Beef to Consumers.



Figure 1

66.     Production of cattle for beef takes considerable time and investment. The life cycle of cattle raised for beef is longer than that of any other animal commonly raised for meat. As illustrated in Figure 1 above, the beef value chain comprises several stages. First, calves are raised by their mothers for six to ten months. When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector, where they are fed a diet of forage, wheat pasture and sileage. When a steer or heifer reaches 600-800 pounds, it is sold to a feedlot, where it is fed corn and protein supplements in addition to roughage.

67.     Once cattle reach 950-1300 pounds, they are sold as "fed" cattle to companies such as Defendants in the beef packing stage. There, Defendants and other beef producers slaughter and process the animals for sale to an array of wholesalers, retailers, food service companies, or other further processors either as commodity "boxed" beef or as smaller "case-ready" consumer cuts. A steer weighing 1,000 pounds typically yields about 450 pounds of edible beef.

68.     Before an industry-wide realignment and consolidation of the beef packing industry over the past several decades, most fed cattle transactions were conducted through direct negotiations and auctions, at prices determined by the market and consistently informed and rationalized by the participation of all the players in the industry.

69.     Post-consolidation, fed cattle are sold to beef processors through two channels. About 70% of fed cattle is sold through supply contracts, known in the industry as captive cattle agreements, with feedlots or, to a lesser extent, ranching operations. The remainder is sold on the spot market, which typically serves as the benchmark for prices

20

under the captive cattle agreements. Because Defendants and other beef producers can ordinarily secure a steady supply of cattle through these agreements, they are not forced to buy in the spot market. This affords them market power that enables them to suppress the price of both cash cattle and captive cattle.

70.     Once they have made their fed cattle purchases at these suppressed prices, Defendants and other meatpackers sell the boxed beef and cuts either in the wholesale market to businesses like Olean, which distribute the beef to retailers, or directly to grocery chains, restaurants and other large retailers. Consolidation at the processing level enables Defendants to extract overcharges on these downstream sales transactions as well, as purchasers like Olean have relatively few processers to whom they can turn to in order to obtain beef. In essence, the Defendants serve as a bottleneck in the distribution chain, suppressing purchase price as they acquire fed cattle and then restricting slaughter to extract a higher sales price from downstream customers.

71.     Tyson, JBS, Cargill, and National Beef all conduct daily internal meetings to determine the volume of cattle they will purchase and make other strategic decisions. Procurement, operations, sales, and risk management executives attend. At these same daily meetings these executives discuss sales strategy.

**B.     Numerous Factors in the Beef Meatpacking Industry Are Conducive to Conspiracies.**

72.     The beef meatpacking industry bears all the hallmark features of markets effectively controlled by cartels. The characteristics favorable to collusion include (1) producer concentration; (2) high barriers to entry; (3) commodity product; and (4)

inelastic demand. Defendants' collusion to constrain the number of cattle entering the supply chain, throttle the volume of processed beef they sold, stabilize the wholesale price of beef, and maximize their margins, was facilitated by the structure of the meatpacking market formation and the operation of Defendants' Conspiracy was facilitated by all of these factors.

## **The Market Is Highly Concentrated.**

73.     Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when just a few firms collectively control a large share of the market. Coordinating cartel meetings and information exchanges are much simpler with a small number of players. A high degree of control also simplifies coordination because there is little outside competitive presence to undermine the cartel, and it is easier for cartel participants to monitor each other's actions related to supply and pricing.

74.     Moreover, in a highly concentrated market, transitory gains in profits and market share that might be achieved by undercutting a cartel price are more likely outweighed by higher, long-term profits secured by the cartel's artificially elevated prices. By contrast, in an industry populated by a large number of firms having slimmer slices of the pie, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully).

75.     The beef industry experienced increased market concentration leading up to and during the Class Period. In 2001, Tyson purchased IBP, then the United States' largest beef packer. In 2002, Cargill purchased another beef packer, Taylor Packing. In 2007 and 2008, JBS acquired Swift & Co and Smithfield Beef Group, respectively the third- and fifth-largest beef packers in the United States.

76.     Throughout the Class Period, Defendants collectively controlled approximately 81-85% of the fed cattle slaughter market. Meanwhile, the next largest meatpacker had only a 2-3% market share. The Defendants' stranglehold on the market enabled the Conspiracy to launch in 2015 and to prosper since then.

## The Market Has Erected High Barriers to Entry.

77.     Barriers to entry are obstacles which prevent new competitors from easily entering the market. They restrict competition in a market and may thereby make it easier for incumbents to collude.

78.     In a well-functioning market, a collusive arrangement that raised product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supra-competitive pricing. But where there are significant barriers to entry, new entrants are less likely to enter the market. Barriers to entry therefore facilitate the formation and maintenance of a cartel.

79.     Barriers to entry kept would-be competitors out of the beef-packing industry during the Class Period. Constructing a large packing plant requires an investment of at least $250 million. It normally takes two years or longer to obtain the necessary permits and plan, design, and build the facility. New entrants must also comply

23

with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan.

80.     These barriers have often caused new entrants to file for bankruptcy shortly after attempting to enter the beef packing market, in the process serving as a cautionary tale for other would-be potential entrants. Such casualties have included substantial enterprises such as Northern Beef Packers and Kane Beef. Relative insulation from the threat of new competitors has enabled Defendants to maintain the Conspiracy with impunity.

### Beef is a Commodity Product.

81.     A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type and generally undifferentiated. Commodities are often used as inputs in the production of other goods or services. Examples of traditional commodities are sugar, wheat, and rubber.

82.     Markets for commodity products are ripe for collusion. Demand for a commodity depends primarily, if not exclusively, on price, as opposed to other attributes such as product quality or customer service. This focus makes commodity markets fertile ground for cartels to sprout and grow because the members can more easily monitor compliance and detect defectors. Any observed price discrepancies for commodities are more likely to expose cheating because they cannot as readily be explained away by attributing differences to other factors, like special product features, quality, reliability and durability, or other terms of a transaction.

83.    Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable and have nearly identical nutritional content, and in most circumstances downstream customers would be unlikely to differentiate between them. The USDA recognizes boxed beef as a commodity, and posts daily boxed beef prices. Options and futures for fed cattle, from which boxed beef is produced, are traded as commodities on the Chicago Mercantile Exchange.

**The Demand for Beef Is Inelastic.**

84.    "Price elasticity" is a term used to describe the sensitivity of producer supply or consumer demand to changes in the price of a good or service. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

85.    Relatively inelastic demand at competitive prices makes initiating and maintaining collusive overcharges much easier. In a highly price elastic market, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

86.    Beef demand is relatively insensitive to price changes. According to a recent study of beef demand, "Since beef has an inelastic demand, industry total revenue increases when prices rise as there comparatively is a limited reduction in volume

purchased."[2] The same study concluded that chicken and pork had little impact on beef pricing. Therefore, supra-competitive prices to Defendants' direct purchasers do not significantly reduce beef sales or lead purchasers to replace their desired level of beef consumption with protein from other meat sources.

## V.    DEFENDANTS' ANTITRUST VIOLATIONS

87.    By the beginning of 2015, Defendants were forced to confront shrinking profit margins for their beef sales. The earnings calls of the two publicly traded Defendants, Tyson and JBS, reported the slumping profitability of their beef operations. In a November 7, 2014 earnings call, Tyson reported a quarterly operating margin that was less than half the margin enjoyed by other divisions.

88.    A week later, on a November 13, 2014 earnings call, JBS also announced a badly underperforming beef segment. Its quarterly margin reached only about a third of other divisions.

89.    Rather than act independently in their individual business interests to restore profitability, Defendants agreed amongst themselves to reduce their collective purchases of fed cattle and slow overall industry levels of beef production to the downstream market, including direct purchasers. The resulting beef shortage ushered in a new era of supra-competitive prices for Olean and other direct purchasers in the wholesale beef market.

---

[2] Glynn Tonsor, Jason Lusk, Ted Schroeder, *Assessing Beef Demand Determinants*, (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.

A.     **Direct Evidence of Defendants' Conspiracy to Constrain Beef Supply.**

90.     As confirmed by Witness 1, each of the Defendants expressly agreed to periodically reduce their respective slaughter volumes, resulting in wholesale prices above competitive levels.

91.     Witness 1 is a former employee of one of the Defendants ("Defendant 1"). Witness 1 was a quality assurance officer ("QA") at one of Defendant 1's slaughter plants located within the Texas Panhandle / Western Kansas region ("Slaughter Plant 1" and "Panhandle Region", respectively) for over 10 years until his employment ceased in 2018.

92.     During the Class Period, Witness 1 acted as a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, i.e., head, hide, and internal organs removed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

93.     Witness 1 learned of the Defendants' slaughter reduction "agreement" from another employee in a position to know about the unlawful "agreement" – Slaughter Plant 1's head of fabrication ("Fabrication Manager").

94.     Witness 1 reports having multiple discussions with the Fabrication Manager during which the Fabrication Manager explained that all the Defendants agreed to reduce their purchase of fed cattle and slaughter volume. For example, during one

conversation, the Fabrication manager specifically admitted that the Defendants had an "agreement" to reduce their purchase and slaughter volumes.

95.    Witness 1 reports that he was in the Fabrication Manager's office when the Fabrication Manager received an angry phone call from his immediate supervisor, who worked out of Defendant 1's central office.

96.    After the call concluded, Witness 1 reports that he asked the Fabrication Manager how "many are we [Slaughter Plant 1] cutting [i.e., fabricating]?" Witness 1 reports that the Fabrication Manager replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[3] The "high" prices referred to the price for fed cattle. Witness 1 then reports asking the Fabrication Manager whether other Defendants' plants were also cutting back their kill. Witness 1 reports he recalls that the Fabrication Manager answered Witness 1's question as follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

97.    Witness 1 recalls specifically that the Fabrication Manager used the word "agreement" and understood that he was referring to at least all of Defendants' plants in the Panhandle Region, namely Tyson Amarillo, Texas; JBS Cactus, Texas; Cargill Friona, Texas; and National Beef, Liberal, Kansas. Each of these plants provide a

---

[3] Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses the were already hanging in the coolers. This would allow Defendant to reap the benefits of higher wholesale prices in the short term.

significant portion of each Defendants' fed cattle slaughter capacity (at least 20% in the case of each Packing Defendant).

98.    Witness 1 is certain that the Fabrication Manager intended to convey that all of the Defendants were reducing their slaughter volumes by agreement with their competitors in response to what they perceived as high prices for fed cattle and was not simply commenting on the fact that one or some of the Defendants had independently decided to do so.

99.    Witness 1 understands that the Fabrication Manager had first-hand knowledge of Defendants' anticompetitive agreement. The Fabrication Manager continues to work at Slaughter Plant 1, where he has worked for over 15 years in that role. In that capacity, the Fabrication Manager reported directly to Defendant 1's head office. As head of fabrication, the Fabrication Manager needed to be informed as to cattle buying, cattle slaughter, and Beef selling aspects of Defendant 1's business. He thus interacted with personnel across Defendant 1's business.

100.    Witness 1 reports that prior to working for Defendant 1, the Fabrication Manager worked at another Packing Defendant ("Defendant 2") for a number of years. Witness 1 understands that Fabrication Manager was head of fabrication for the slaughter plant operated by Defendant 2 in the Panhandle Region at which he was employed ("Slaughter Plant 2").

101.    The Fabrication Manager regularly told Witness 1 that he was in contact with his former colleagues at Slaughter Plant 2, including his replacement there. The

29

Fabrication Manager also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Packing Defendant plants.

102.    The Fabrication Manager would often provide Witness 1 with detailed information as to the current and future operations of the Defendants' nearby packing plants. Witness 1 regularly stopped by the Fabrication Manager's office prior to starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days, as this affected the execution of his and his team's responsibilities. Witness 1 and the Fabrication Manager had a good working relationship.

103.    Witness 1 stated that Slaughter Plant 1 had a 5,500-6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800-5,200 head per day when implementing Defendants' agreement. While Defendant 1 implemented the Defendants' agreement by buying and slaughtering fewer cattle, it also collusively reduced supply by running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns.

104.    Defendants meanwhile coordinated and agreed to refrain from expanding their slaughtering and processing capacity, thereby further restricting supply, as further described below.

**B.    As Planned, the Conspiracy Significantly Reduced Defendants' Beef Processing During the Class Period.**

105.    The impact of the Conspiracy was sudden and dramatic, evidenced by data published by the USDA. Each Defendant cut its annual cattle slaughter volumes during

the Class Period by an average of about 13%. In sharp contrast, other meatpackers increased their slaughter volumes during the same time period by an average of 28 %.

106.    Data breaking out slaughter volumes for each year of the Class Period highlight Defendants' extreme reductions in 2015, while other beef producers maintained or increased their volumes that same year. Despite a slight catchup uptick in the final quarter of 2015, Tyson's overall 2015 slaughter volume was down by 4% as compared with 2014 levels, JBS by 17%, and National Beef by 6%. Cargill's 2015 production was flat compared with the prior year but well below historical levels. All this occurred in the midst of a sustained recovery in the broader economy and as the U.S. population grew steadily.

107.    And while Defendants gradually increased their slaughter volumes over the rest of the Class Period, their rates of increase lagged far behind those of other producers, as evidenced by the following figure:

**Average Pre- and Post-Class Period Fed Cattle Slaughter –
Defendants vs. Smaller/Independents**



### C.   Defendants Idled, Closed Plants, and Refrained from Expanding Processing Capacity.

108.   The Conspiracy also entailed a longer-term strategy to restrict beef

supplies. Defendants agreed to permanently close processing facilities without replacing

the lost capacity. These actions came on the heels of a series of plant closures shortly

before the Class Period, including the following:

　　a.   On January 17, 2013, Cargill announced that it would shut down its

　　　　　Plainview, Texas beef processing facility, one of Cargill's larger plants,

　　　　　in just two weeks. This closure cut Cargills's slaughter capacity by 4,650

cattle per day, which was "nearly 4% of the U.S. beef industry current capacity."[4]

b.  On February 1, 2013, the same day Cargill shuttered its Plainview facility, Tyson reported a "reduction in live cattle processed" in its Q1 2013 Form 8-K. Tyson did so despite reporting "increased production due to sufficient cattle supply and strong demand for our beef products" for the previous quarter in its Q4 2012 Form 8-K.

c.  JBS followed suit by acquiring an inactive plant in Nampa, Idaho in April 2013, only to keep it idle. JBS stated that it had "no immediate plans to reopen the facility," which would be capable of processing about 1,100 cattle per day, and it apparently remains idle to this day.

d.  Next, in June 2014, National Beef closed its Brawley, California plant. This eliminated another 2,000 cattle per day of slaughter capacity.

e.  The following month Cargill announced that it would also close its Milwaukee, Wisconsin plant on August 1, 2014. This closure decreased the industry's slaughter capacity by another 1,300 to 1,400 cattle per day.

f.  Also in 2014, Tyson shut down its Cherokee, Iowa processing plant. Four years later, Tyson agreed to sell the plant to a competitor, but only

_____

[4] Apr. 3, 2013 Votorantim Equity Research Report on JBS.

by imposing a condition that "limited the amount of cattle that can be
processed at the plant for the next 10 years."

109.   Defendants continued to shrink the beef industry's processing capacity
when the Class Period began:

g.   On September 11, 2015, Cargill announced that it would sell the
Plainview, Texas plant that it idled in February 2013.

h.   For its part, Tyson reported a "reduction in live cattle processed" for
each of the eight quarters from Q2 2014 to Q1 2016 in its Form 8-Ks for
those quarters. Tyson did so despite "[l]ow production volumes relative
to demand[,]" and "adequate supplies for [its] beef operations." These
conditions had contributed the "historically high wholesale beef prices"
that Tyson reported in its Ql 2014 8-K.

i.   In August 2015, Tyson decreased the industry's slaughter capacity by
yet another 2,000 cattle per day by shuttering its Denison, Iowa plant.

110.   By idling these plants, Defendants collectively slashed the industry's
annual slaughter capacity by some two million cattle per year. Compounding the supply
shortage, Defendants also underutilized the remaining capacity. To defend their actions,
Defendants could only muster pretextual reasons, such as a lack of available cattle in the
adjacent regions and plant inefficiencies.

111.   The overall industry slaughter capacity increased slightly between 2016 and
2017, but this nominal gain was not the work of any Defendant. It was attributable to two
other beef processing companies. For example, One World Beef Packing restored about

2,000 cattle per day by reopening the Brawley, California plant closed by National Beef in 2014. And the Defendants' market dominance and stranglehold on the industry meant that these minor incursions by the few remaining independent processors increased availability only in isolated pockets and had negligible effect on restoring supply in most locations.

112.    JBS was the only Defendant that made any significant capital investment to increase industry slaughter capacity during the Class Period. JBS expanded its Hyrum, Utah plant in 2015 and 2016.  However, according to JBS press releases and several industry publications, the purpose of that expansion was to increase its capacity to process culled dairy cows, not fed cattle. Unlike fed cattle, culled cows are not used for boxed beef—the product at issue in this lawsuit—but rather for ground beef.

113.    Tyson did complete upgrades to its Dakota City, Nebraska plant in April 2015, but that was the result of repeated delays in a project begun in March 2012, originally scheduled to be completed in about one year.

**D.    Defendants Publicly Urged Each Other to Maintain the Conspiracy.**

114.    One method Defendants used to coordinate and monitor the Conspiracy was to signal their activities and plans to each other during earnings calls. The signaling during the Class Period was built on a foundation laid by earlier calls. Examples of these communications include the following, presented in chronological order:

- During a March 2013 Q4 earnings call, JBS affirmed that it would not increase capacity: "Yeah, so about beef in US like I mentioned and like you mentioned here in the call, we expect and we believe the market will improve

35

in some way from the second quarter on. We are not adding capacity. So we
will not increase or improve our capacity utilization in US because we need
to balance in our business supply and demand. So everybody knows that the
US herd is shrinking and there is less cattle available. So we are not going to
increase capacity or to run our plants with better capacity utilization.
Actually the other way around, we are also reducing in some extend, reduce
some hours to balance better the market and to try to improve margin in our
business."

- During a January 2014 Q1 earnings call, Tyson's COO stated that National
  Beef's decision to close its Brawley, California plant "is consistent, I guess,
  with what we've been saying all along, as the calf crop declines and the
  noncompetitive feedlot areas or noncompetitive plants or the combination
  thereof, we'll probably have to curtail production . . . to some extent, we've
  always felt that – and anticipated something like that would happen."

- During a May 2014 earnings call, JBS offered this industry forecast: "For
  2015, I think beef will keep being tight. I don't see any increase in beef
  supply in 2015 in U.S."

- During an August 22, 2014 Q2 earnings call, JBS's Global CEO Wesley
  Mendonça Batista noted, "In the last 12 months or more, year-and-a-half, we
  saw five plants that [shut down in the U.S.], and [that definitely] is going to
  help to balance the supply and the industry capacity to be much more
  balanced, and we are optimistic that we are going to see good improvement

on the beef business." He added, "[A] couple of things that we are more optimistic about the beef business in U.S. First of all is, of course, the industry adjusting capacity is a key factor. Five plants closed in the last year-and-a-half, so this looks almost 8,000 [head] per day out of the market, so for sure this is a key factor to help balance the industry to have a better margin and a better results … in our view, the worst period on the beef business is behind."

• The following quarter, Mr. Batista suggested during a November 2014 Q3 earnings call that JBS's recent acquisition of XL Foods' Omaha, Nebraska plant was probably a mistake, and that slaughter capacity must be reduced in California and at least one other U.S. region. In his words, "If you want to be balanced you need to have capacity to be shut there."

• During a November 2014 Q4 earnings call, Tyson gave the other Defendants this projection: "So as you know with really high beef prices, beef volume is down. … [W]e already know that the beef supply, the beef herds are going to be down another 4%, which portends pretty high beef prices again into the future."

• During Tyson's 2014 Investor Day, the company communicated that high beef prices would prevail in the near future: "Now, if you look at elevated beef prices, coming in to this year, beef supply will be down about 5% or so versus last year. Next year, because we already see the calf crop, we know that next year's beef supply will be down another 4% or so. So, elevated beef

37

prices are here to stay for a while. It would take us several years, maybe out to 2020 to be able to grow the supply of cattle back to FY 2013 number. So we're going to have high beef prices for a while ..." Tyson went on to explain how the reduction in supply was contributing to greater profit margins: "By rationing that [fed cattle] supply, by lowering that volume coming into the market, we're able to generate that margin spread. And that's not going to change anytime soon. As we continue on in these tightened supply periods, we're going to continue to manage margin. And our expectation as we roll into next years, we're going to see similar type earnings as what we've seen."

• During a May 2014 Q4 earnings call, Tyson communicated that it was striving for margin and not market share: "For fiscal 2015, we expect fed cattle supply to be down 5% to 6% from last year. And we think we've experienced the bottom of the beef supply cycle. After this year, we believe we'll see slow incremental improvement in supply. Our beef segment results should improve in the back half of the year, and while profitable for the year, fiscal 2015 results are expected to be below fiscal 2014. It is important to remember that we'll continue to run our beef business for margin not market share."

• During Tyson's Q3 earnings call, its then-CEO Donald Smith stressed the need for further slaughter reductions in the industry: "Because we run for margin and not for market share, we're not willing to overpay for cattle and

we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate, and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization [was] probably in the low 70s."

• During Tyson's call for the following quarter, Mr. Smith further acknowledged that "excess industry capacity ... limits [Tyson's] ability to drive margins above[] 1.5% to 3%, we think."

• On JBS's November 12, 2015, Q3 earnings call, Andre Nogueira de Souza publicly praised Defendants' efforts to reduce industry-wide slaughter capacity through plant closures, remarking that "the reduction that we saw in the capacity of production in U.S. … with the shutdown of 90 plants the last two years reduce the cattle - the capability of U.S. to process 3.5 million," which had placed the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."

• On a May 2016 Ql earnings call, JBS's Mr. Nogueira de Souza described the company's supply strategy: "So I don't see any imbalance in this near future, even cattle is coming back and we're going to see a little bit more production of beef this year and next year. It's still way, way below how it was few years ago and we'll be balancing at this side because a lot of plant was shut but it's too way below our historical production level."

These examples document a consistent pattern of public communication with other Defendants during the Class Period to further the Conspiracy.

## VI.   EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

### A.   As Defendants Intended, the Conspiracy Increased the Spread Between Fed Cattle and Beef  Prices.

115.   Leading up to the Class Period, droughts from 2011 through 2013 caused fed cattle prices to steadily increase, and wholesale prices of beef predictably moved in tandem, maintaining a constant relationship – or margin – between the two. As a result, Defendants' profits were trimmed to margins of only 1% to 3%.

116.   As the DOJ has recognized, when the beef market is functioning competitively, there is a strong relationship between the supply of cattle and the price being charged to direct purchasers:

> All else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short term changes in price, even small changes in industry production levels can significantly affect packer  profits.[5]

---

[5] Amended Complaint, ¶ 26-27, *U.S. v. JBS SA* (N.D. Ill., Eastern Division) (08-cv-05992), filed on November 7, 2008.

117.    Thus, in a competitive market, lower cattle prices should lead naturally to lower wholesale beef prices. Once the Conspiracy took hold, however, the spread between cattle and beef prices—what the Defendants referred to amongst themselves as the "margin"—grew significantly. Defendants' concerted restriction of the beef supply caused cattle prices to slump while their direct purchasers were charged artificially elevated prices for beef that would not have prevailed in a competitive market but for the artificial supply restraints

118.    Figure 2 below, a graph constructed from published USDA data, captures the steep climb of the spread that began after very minimal growth from 2012 to 2015:



Figure 2

**B.    Tyson and JBS Falsely Claimed That Their Record Profits Were the Fruit of Market Prescience, Not Supply Constraints.**

119.    Tyson and JBS continued to report elevated profit margins throughout 2017 and 2018. On earnings conference calls during this period, executives from JBS and Tyson frequently attributed their historically high profits to their ability to predict with precision the volume of cattle that would enter the beef supply chain in the upcoming years. Examples of these boasts include the following:

42

- On August 7, 2017, Tyson reported a beef business operating margin of 3.7 % for the third quarter and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions for our beef business as far out as 2020, as we enter the early stages of a multiyear expansion cycle. Absent a shock to the system such as a drought or an import ban, our beef business is well-positioned for profitable, long-term growth." Tyson acknowledged that it was considering raising its previously-forecasted 1.5-3% normalized operating margins. But, despite "ample" supply of cattle and high demand for beef, Defendants did not increase cattle purchases or cattle slaughter.

- On February 8, 2018, Tyson reported quarterly operating beef margins of 6.6% and yearly beef margins close to 6% and emphasized that it had "pretty good visibility into '19 and '20 at this point." "We see the number of animals out there," executives said. Tyson further stated that "we have... good visibility into the cattle that's out there. We see the number of animal so that's that certainly good for us."

- On May 7, 2018, Tyson announced forecasted beef operating margins of 6% for the year-at least twice its normalized operating margin range of 1.5-3%. Tyson claimed the huge jump was attributable to "those cattle on feed reports and knowing that the supplies in our region are exceptionally good."

- Likewise, on May 15, 2018, JBS reported an EBITDA margin of 6.1 % for the quarter and forecasted that the company would enjoy record beef margins

43

for the next two quarters. JBS emphasized that its performance was not based on "taking share from anyone."

• On August 6, 2018, Tyson reported a beef operating margin of 8% for the quarter. Tyson stated that it had an "optimistic outlook" because "we have good visibility into 2021... that's good because we do see the number of animals that are out there."

• On August 15, 2018, JBS reported a beef EBITDA margin of 10.2% for the quarter and stated that it was "moving the overall margin in beef... [to) a different level that was in the past." JBS went on to say that it benefitted from shutting several plants in the previous five years, and that it could not see how U.S. beef could "be less profitable in 2019 compared to 2018."

• On November 13, 2018, Tyson reported record beef operating margins of 8.9% for the quarter and 6.7 % for the year, and stated that it expected similar results in the following years thanks to visibility into cattle supply: "As we look at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."

## VII.    ADDITIONAL FACTORS FACILITATING DEFENDANTS' CONSPIRACY

### A.    Defendants Took Advantage of Numerous Opportunities to Collude.

120.    Defendants are members of industry trade associations and forums and regularly attend industry events, including those listed below. These events provide

ample opportunity to exchange pricing, supply, and other competitively sensitive information.

121.    The National Cattlemen's Beef Association ("NCBA"), for example, holds an annual convention known as "CattleCon," which includes a summer conference, a legislative conference, and regional meetings. The NCBA Product Council, which includes representatives of Defendants, meets quarterly for an invitation-only beef Executive Forum. Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils, held contemporaneously with the NCBA summer and winter meetings.

122.    The U.S. Meat Export Federation, a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former employees and officers of Defendants, also holds both spring and fall conferences and monthly international trade shows.

123.    Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef, and they remain members. Defendants participate in the organization's annual meetings each spring, and JBS and Cargill have leadership positions in some of the working groups.

124.    Defendants also came together for numerous meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute ("AMI"). Each Defendant maintained membership in these organizations throughout the Class Period and was represented on their boards. These representatives included:

- <u>Cargill</u>: John Keating;

- <u>JBS USA</u>: Andre Nogueira de Souza, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp;

- <u>National Beef</u>: Tim Klein; and

- <u>Tyson</u>: Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren.

125. The beef industry's "Annual Meat Conference," described on its website as "a complete education and networking experience," provides another opportunity for Defendants to confer. Many of Defendants' high-level executives have been attending this conference for years. The list of registered attendees in 2012, for example, included eight executives from JBS USA, Tyson Foods' then-CEO Donnie Smith, and twelve other Tyson executives.

126. Until April 2017, NAMI also sponsored an annual "Meat Industry Management Conference," which offered topics such as "economics" and "general business." That conference was then replaced by an annual "Meat Industry Summit." This summit has sponsored "networking opportunities and social events" including a golf tournament, receptions, an "Issues, Answers, Actions Breakfast," the annual NAMI board meeting, and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

127.    These industry events afford Defendants' top executives and their other employees frequent opportunities to discuss pricing, production, and other proprietary information in an informal setting, and to monitor compliance with the Conspiracy.

**B.    Reduction of Cattle Imports.**

128.    Defendants did not offset their slaughter reductions by importing more cattle. In fact, the volume of imported cattle began falling in 2015. This downward trend continued throughout the Class Period, exacerbating the domestic fed cattle shortage, as evidenced by this figure:



129.    Furthermore, certain Defendants shuttered international plants, thereby decreasing the supply of cattle available to be imported into the United States, which

could otherwise offset the conspiratorial reductions by Defendants. For example, JBS shuttered 6 plants in 2015. In August 2015, in response to a question regarding "beef capacity"—specifically, competitors "talking about how many plants they closed during the quarter et cetera . . . it looks like an industry-wide move[,]"—JBS's Mr. Batista remarked that JBS "closed six plants in these two quarters . . . we are the leader in this market and we closed this plant as well . . . for me it's clear that now the industry is balanced in terms of cattle availability and also demand. And for me it's clear that the industry is not going to put back any plants until the industry see a sustainable demand recovery and as well cattle availability."

130.   This double-whammy of reduced domestic and imported cattle processing combined to raise beef prices paid by Olean and other Class members above competitive levels.

### C.   The Industry Faces a Cascade of Governmental Investigations and Inquiries.

131.   Price fixing, concerted output restriction, and other anticompetitive conduct, especially in an industry as large, prominent, and vital to national well-being as food production, eventually attract governmental scrutiny. The nation's antitrust enforcers, along with politicians and other government regulators, have an interest in putting a stop to such practices, but not in leveling false accusations. Over the past year, Defendants' market power and brazen profiteering, made even more unattractive by the Covid-19 pandemic, has caught the attention of politicians and regulatory bodies alike.

The investigations confirm both the egregiousness of the conduct and Defendants' culpability for their illegal acts.

132.    In August 2019, the U.S. Department of Agriculture ("USDA") opened an investigation into the industry following a fire at Tyson's Holcomb, Kansas plant. The USDA took notice after the reduction in available supply simultaneously caused cattle prices to fall while elevating the price of boxed beef.

133.    On March 19, 2020, U.S. Senators Mike Rounds of South Dakota, Kevin Cramer and John Hoeven of North Dakota, and Steve Daines of Montana sent a letter to the U.S. Department of Justice (DOJ) urging the department to launch an investigation into price-fixing in the cattle market. The authors noted the harm caused by Defendants both to upstream producers and downstream consumers. On a conference call reported in the press Senator Rounds stated the request was for the DOJ "to definitively answer whether a packer oligarchy exists within the cattle market and inherently creates an anti-competitive marketplace that unfairly disadvantages the cattle producer and the consumer." Senator Rounds further commented, "These margins just don't make any sense. The reality is there is an inverse correlation between the producer's price and the consumer's price."

134.    On April 8, 2020, Reuters reported that the USDA had extended its existing investigation to include a pricing dynamic similar to what was observed after the Holcomb fire—reduced prices paid to ranchers for cattle accompanied by a surge in retail beef prices—in the wake of announced production shortages associated with the nationwide outbreak of Covid-19.

135.   On April 17, 2020, state-level cattle production trade associations from 23 states signed a letter to Attorney General William Barr requesting that the DOJ coordinate with the USDA and launch its own investigation into "fraudulent business practices within the meatpacking industry." Signatories included the Minnesota State Cattlemen's Association. The letter noted the two extraordinary pricing episodes, following the Holcomb fire and in the midst of the Covid-19 outbreak, earlier identified by the USDA. The state trade associations not only reported their own plight; rather, they observed, "The nature of previous and current concern in both situations is extreme market degradation to the producer segment quickly followed by sharp increases and unseasonable profitability to the packing segment through boxed beef prices." And they noted with respect to the most recent manipulations, "We are now seeing that same type of price action [observed after the Holcomb fire] repeated – only in a more extreme manner and during a time of crisis that includes logistical stressors on the nation's food production and distribution system." Indeed, in the last analysis, Defendants' conduct portends more than mere profiteering, and if left unchecked will remain a direct and gathering threat to the country's food security in the midst of crisis.

136.   On May 5, 2020, 11 state attorneys general representing agricultural heartland states, including the state attorney general for the State of Minnesota, signed a joint letter to U.S. Attorney General Barr urging DOJ to open a coordinated federal antitrust investigation into "anticompetitive practices by the meat packers in the cattle industry." This letter as well highlighted the two-way value extraction made possible by

Defendants' market power: "Cattle ranchers . . . often struggle to survive. Consumers, moreover, do not realize the benefits from a competitive market."

137.    On June 4, 2020, Bloomberg reported that DOJ had served civil investigative demands on Tyson Foods Inc., JBS SA, Cargill Inc., and National Beef Inc., all Defendants here, in connection with an investigation into antitrust violations, consistent with the earlier requests by the producer trade associations and state attorneys general.

## VIII.  ANTITRUST INJURY

138.    The fed cattle market is an oligopsony consisting of the four Defendants, which purchase most of the cattle for slaughter and most of the beef sold in the wholesale market. When Defendants colluded to restrict demand, the market effectively became a monopsony that left cattle ranchers with no choice but to accept whatever price Defendants offered.

139.    In a competitive market, the volume of fed cattle purchased by beef producers would be the volume where supply matches the demand/marginal revenue product curve, and the price for that fed cattle would be the additional revenue that the producers would receive for fed cattle. When Defendants collaborated to restrict supply, they exercised their monopsony power to compel cattle ranchers to accept the price Defendants offered, driving down the market price. In this manner, Defendants' monopsony power enabled them to maximize their profit by purchasing fewer cattle at a lower price.

140.    Conversely, from the standpoint of direct purchasers of commodity boxed beef, such as Olean, the Defendants function as an oligopoly in control of most of the industry supply. When Defendants colluded to restrict supply, the market for boxed beef became a monopoly in which the Direct Purchaser Plaintiffs were forced to buy at prices dictated by the Defendants acting in concert.

141.    Because no other source was offsetting the shortages, Defendants created the restricted supply of fed cattle restricted supply of beef in the downstream market to direct purchasers. Defendants exacerbated this restriction through their concerted manipulation of slaughter capacity and processing volume. Because Defendants have this accompanying downstream market power, they have been able to maximize their profits by colluding to produce volumes based on their marginal revenue curve instead of the market demand curve, which increases wholesale prices paid by Olean and other purchasers.

142.    In summary, without fear of competition from other meatpackers, Defendants' collusion had the dual effect of (1) artificially decreasing the price which Defendants paid for fed cattle; and (2) artificially increasing the price they charged for their beef products.

143.    Defendants' collective monopoly power and anticompetitive conduct had the following effects, among others:

- Price competition in the beef market has been restrained or eliminated;

- Prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been raised and fixed at artificially high, non-competitive levels throughout the United States;

- Direct purchasers of beef such as Olean have been deprived of free and open competition; and

- Direct purchasers have therefore paid artificially inflated prices.

144.   The purpose of Defendants' and their co-conspirators' conduct was to raise, fix, or maintain the price of beef above a competitive level. As a direct and foreseeable result, Olean and Class members paid supra-competitive prices for beef during the Class Period.

145.   Defendants' violations of the Sherman Act have therefore caused Olean and other Class members to suffer injury to their businesses or property.

146.   This harm is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.   DEFENDANTS ACTIVELY CONCEALED THE CONSPIRACY.

### A.   Fraudulent Concealment

147.   Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed the Conspiracy from Olean and other members of the Class.

148.   Defendants used various means and methods to fraudulently conceal the Conspiracy, including but not limited to secret meetings, surreptitious communications between Defendants by telephone or in person meetings to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply-restraint

53

communications on documents, and by communicating competitively sensitive data to one another.

149.   The Conspiracy, by its very nature, was self-concealing. Beef is not exempt from antitrust regulation, and thus, before recent events, Olean and other customers of Defendants reasonably considered the beef industry to be competitive. Defendants are also large, integrated corporations with sophisticated leadership and full legal departments. A reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' unlawful conduct before these recent events.

150.   Furthermore, Defendants actively concealed their unlawful behavior from Olean and their other customers by means including:

- communicating with each other by telephone about their purchases and slaughter volumes so that they would not have written evidence of sharing this information with a competitor, as well as relying on non-public forms of communication;

- offering false or pre-textual rationales for the low prices of fed cattle;

- providing pre-textual justifications for their plant closures, slaughter reductions, and withdrawal from the case cattle trade;

- explicitly and implicitly representing that the fed cattle bids and contract terms offered to Olean and other customers by Defendants were the product of honest competition and not a conspiracy;

- affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and

54

- misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

151.   As alleged above, Defendants ostensibly provided valid justifications for plant closures, slaughter reductions, and withdrawal from the cash cattle trade. However, as the following examples indicate, such justifications were pretextual.

152.   The Conspiracy was inherently self-concealing because it depended on secrecy for its successful operation. Had the public learned that Defendants were conspiring to limit supply and fix prices, the Conspiracy could not have survived as long as it did. Olean and other customers could not have learned of Defendants' anticompetitive conduct until recently, through disclosures by an industry insider of otherwise inaccessible information.

153.   As a consequence of Defendants' fraudulent concealment of the Conspiracy, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action of Olean and the other Class members arising from Defendants' unlawful conduct.

**The Cargill Defendants**

154.   As alleged above, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the Conspiracy.

155.   To facilitate the Conspiracy, the Cargill Defendants routinely utilized public statements to conceal Defendants' unlawful activity. For example, Cargill used its 2017 Annual Report to explain that "[r]enewed consumer demand for beef . . ." produced

"favorable market conditions in North America." The following year, Cargill proclaimed that its Animal and Nutrition & Protein segment's "strong performance" in 2018 was "fueled by rising domestic and export demand for North American beef."

156.    These pretextual public statements were made to obscure the Cargill Defendants' role and participation in the Conspiracy. Instead of disclosing that their "strong performance" stemmed from the supra-competitive profits, Cargill provided pretextual business justifications such as "favorable market conditions" and "rising domestic and export demand."

**The JBS Defendants**

157.    As alleged above, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the Conspiracy.

158.    To facilitate the Conspiracy, the JBS Defendants routinely utilized public statements to conceal Defendants' unlawful activity. For example, JBS executive Andre Nogueira declared in November 2015 that "[c]attle price will go down [sic]" in the United States because "we are going to see more cattle available." Similarly, JBS CEO, Wesley Mendonca Batista, stated in March 2016 that JBS would see "better margin[s]" due to an "increase in the herd in the U.S." JBS executives continued to make such statements throughout 2016, 2017, and into 2018, regularly claiming that JBS's strong financial performance in the United States was a result of "more cattle available in the U.S.," "cattle price[s] ... [being] back to the normal level," and "strong demand for beef."

159.    These false public statements were made to obscure the JBS Defendants' role and participation in the Conspiracy. Instead of disclosing that the "improvement in

EBITDA margin" was the result of supra-competitive profits from the Conspiracy, the JBS Defendants provided pretextual business justifications such as there being "more cattle available in the U.S." and cattle prices returning "back to the normal level."

### National Beef

160.   To facilitate the Conspiracy, National Beef, through its majority shareholders Jefferies Financial Group Inc. ("Jefferies" or "Jefferies Financial Group") and later Marfrig Global Foods S.A. ("Marfrig") routinely utilized public statements to conceal Defendants' unlawful activity. On information and belief, National Beef was the original and knowing source of every pretextual public statement ostensibly made by Jefferies and/or Marfrig to conceal the Conspiracy. For example, Jefferies Financial Group stated in October 2015 that the anticipated expansion of the cow-herd "bodes well for [meatpacking industry] margins as it will lead to an increase in the number of fed cattle available for slaughter." In October 2016, Jefferies Financial Group explained that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when justifying how "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle has fallen from $1.48 to $1.16." Similar justifications were offered throughout 2017 and 2018, such as Jefferies Financial Group's statements that: "National Beef generated record results for [Last Twelve Months] on the back of a more balanced supply of cattle and robust end market demand"; "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016"; "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins"; and "because the peak in supply of fed

cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins." These statements were made during Jefferies Financial Group Investor Day presentations in 2015, 2016, and 2017, at which National Beef's CEO and President, Tim Klein, was scheduled to speak on topics related to National Beef's performance.

161.   Marfrig similarly continued to offer pretextual justifications for the low prices caused by the Conspiracy after it acquired a controlling stake in National Beef. For example, Marfrig reported in November 2018 that "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins." During a third quarter company earnings call in 2018, Marfrig executives reiterated this point by claiming that "the U.S. beef industry has delivered record results" because of "an ample supply of cattle" and "strong demand in both the domestic and international markets." Although Marfrig revealed it had attained "record results" and "better margins" while reducing cattle slaughter volumes, it misrepresented that these results were due to "fewer weeks in the third quarter 2018 compared to the third quarter 2017."

162.   National Beef CEO, Timothy M. Klein – referred to by Marfrig CEO, Eduardo de Oliveira Miron, as "CEO of [Marfrig's] North American Operations" – participated in that 2018 call. In the same vein, Marfrig announced in the fourth quarter of 2018 that it attained a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."

58

163.    Jefferies and Marfrig made these pretextual public statements on behalf of National Beef – which, as alleged above, was the original source of their pretextual public statements – to obscure its role and participation in the Conspiracy. Instead of disclosing that its "record results" and "better margins" stemmed from the supra-competitive prices implemented by the Conspiracy, Jefferies and Marfrig provided pretextual business justifications such as the "ample supply of cattle," "higher cattle availability," and "strong demand."

164.    While operating the Conspiracy, Defendants publicly misrepresented that they complied with antitrust laws. Instances of these false claims professed by Defendants during the Class Period include the following:

- Tyson's Code of Conduct touts that "[w]e compete in the market with integrity and comply with competition laws ... [w]e comply with the letter and spirit of competition laws (also referred to as "antitrust" laws) wherever we do business."

- JBS's 2014 Annual Report asserts that the company has clear policies "[t]o ensure ethical conduct and integrity in the management of its business," including a Manual of Ethical Conduct "that addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, and other sensitive topics."

- Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation

and Guiding Principles are built We conduct our business with integrity We compete vigorously, but do so fairly and ethically. We ... comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reaffirmed this commitment in subsequent Corporate Responsibility reports.

- National Beef's former majority shareholder, Jefferies Financial Group acknowledged in its 2014 Annual Report that National Beef was "subject to extensive government regulation," including the USDA's.

### The Tyson Defendants

165.    As alleged above, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the Conspiracy.

166.    To facilitate the Conspiracy, the Tyson Defendants routinely utilized public statements to conceal Defendants' unlawful activity. For example, the Tyson Defendants used their SEC filings from 2015 to 2018 to declare they had "limited or no control" over the pricing and production of cattle, because prices are "determined by constantly changing market forces of supply and demand." As for the factors that do influence the cost of cattle, the Tyson Defendants identified "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments." The Tyson Defendants further stated that they "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies." The Tyson Defendants also claimed that "[t]he beef segment earnings

improved ... due to more favorable market conditions associated with an increase in cattle

supply which resulted in lower fed cattle costs."

167.    Rather than truthfully disclose that it was the Conspiracy that improved

their earnings, the Tyson Defendants issued pretextual business justifications such as

"lower fed cattle costs" and "favorable market conditions." The Tyson Defendants made

these misrepresentations to obscure their role and participation in the Conspiracy.

168.    The Conspiracy was inherently self-concealing because it relied on secrecy

for its successful operation. Had the public learned that Defendants conspired to lower

supply and fix prices, the Conspiracy would not have continued as long as it has. Neither

Olean nor other customers of Defendants could have learned of the anticompetitive

conduct alleged by Plaintiff until recent disclosures of concealed information by an

industry insider.

169.    In particular, a GAO Report issued in April 2018 did not reveal

Defendants' anticompetitive conduct. The GAO had limited investigative authority and

"did not obtain and review internal packer documents." Its report explicitly did not

consider whether Defendants engaged in anticompetitive behavior of the kind alleged

here. Olean and other customers of Defendants have not obtained or reviewed internal

packer documents either.

170.    Because of Defendants' fraudulent concealment, Olean and the rest of the

Class had insufficient information concerning Defendants' misconduct on which to base

a complaint and could not have discovered it through the exercise of due diligence until

recently. Olean has acted diligently in seeking to bring its claims promptly. Accordingly,

61

the running of any statute of limitations has been tolled and suspended regarding any claims and rights of action that Olean and the other Class members have because of the unlawful combination and conspiracy alleged.

**B.    Continuing Violations**

171.    The Conspiracy began operating no later than January 1, 2015 and continues to operate today.

172.    Each Defendant engaged in the Conspiracy to suppress the supply of fed cattle entering the beef value chain, which induced the higher beef prices paid by Olean and other Class members.

173.    As a direct result of Defendants' unlawful conduct throughout the Class Period, Defendants were able to and did sell beef to Olean and other Class members at artificially inflated prices.

174.    Defendants' acts in furtherance of the Conspiracy have continued throughout the Class Period. Each sale of boxed beef by one of Defendant's at a supra-competitive price was a new overt act causing injury to Olean and the rest of the Class.

175.    Defendants continue to engage in the anticompetitive conduct alleged in this Complaint, still selling beef at artificially inflated prices.

**X.    CLASS ACTION ALLEGATIONS**

176.    Plaintiff invokes Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of Olean and other members of the following class of direct purchasers (the "DPP Class"):

All persons and entities who purchased beef directly from any of the Defendants or their respective subsidiaries or affiliates for use or delivery in the United States from at least January 1, 2015 until the present. Specifically excluded from this Class are Defendants; their officers, directors or employees; any entity in which a Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of a Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action, the members of the judicial officer's immediate family and staff, and any juror assigned to this action.

177. Class Identity: The DPP Class is readily identifiable and one for which adequate records are expected to exist.

178. Numerosity: Due to the nature of the trade and commerce involved, Olean believes there are thousands of Class members, their exact number and identities being known to Defendants and their co-conspirators.

179. Typicality: Olean's claims are typical of the claims of the members of the DPP Class because Olean purchased beef directly from one or more Defendant during the Class Period and has been injured in the same way, by paying more for beef than they would have but for the Conspiracy. Olean's claims arise from the same common course of conduct, give rise to the same claims of injury, and seek the same relief as those of the other members of the Class.

180. Common Questions Predominate: Questions of law and fact common to the DPP Class include but are not limited to:

A. Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of beef sold in interstate commerce in the United States;

B. The identity of the participants of the alleged conspiracy;

63

C.    The duration of the Conspiracy and the acts performed by Defendants and their co-conspirators in furtherance of the Conspiracy;

D.    Whether the Conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

E.    Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Olean and the other members of the DPP Class;

F.    The effect of the Conspiracy on the price of beef sold in the United States during the Class Period;

G.    Whether Olean and other members of the DPP Class suffered antitrust injury, and the appropriate class-wide measure of any such damages; and

H.    Whether Olean and other members of the DPP Class are entitled to injunctive relief, and the nature and extent of such injunctive relief.

These and other questions of law and fact common to all members of the DPP Class predominate over questions affecting only individual members of the Class.

181.   Adequacy: Plaintiff will fairly and adequately protect the interests of the DPP Class because Olean's interests are aligned with, and not antagonistic to, those of the other members of the Class. Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent them and the DPP Class.

182.   Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy for reasons including the following: (1)

64

individual joinder of all class members is impractical; (2) prosecution as a class action will eliminate the possibility of duplicative litigation; (3) prosecution of separate actions by individual members of the DPP Class would create the risk of inconsistent or varying decisions and adjudications, creating uncertain and potentially incompatible standards for adjudicating the claims and defenses asserted in this action; (4) the relatively small amount of damages suffered by individual members of the Class, when compared to the expense and burden of individual prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and (5) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

183.    In addition, Defendants have acted on grounds generally applicable to the DPP Class, making final injunctive relief appropriate for the Class as a whole.

## XI.    VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

184.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

185.    Beginning at least as early as 2015 and continuing through the present, the exact dates unknown to Olean, Defendants and their co-conspirators entered into and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to artificially fix, raise, and stabilize the wholesale price for beef in the

United States, creating anticompetitive effects, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

186.   Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

187.   Defendants and their co-conspirators conspired to conceive and further the objects of the Conspiracy, as alleged above, including but not limited to the following acts, practices, and course of conduct:

- Fixing, raising, and stabilizing the wholesale price of beef;  and

- Allocating among themselves and collusively reducing the production of beef.

- The combination and conspiracy alleged has had these effects, among others:

- Price competition in the sale of beef has been restrained, suppressed, and/or eliminated in the United States;

- Prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Olean and other members of the DPP Class who directly purchased beef from Defendants, their divisions, subsidiaries, and affiliates, and all of

their co-conspirators, have been deprived of the benefits of free and open competition in the purchase of beef.

188. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for beef throughout the United States because Defendants sell their beef throughout the country and in every state.

189. The conspiratorial acts and combinations have caused unreasonable restraints in the market for beef.

190. Olean and other members of the DPP Class have been injured and will continue to be injured in their businesses and property by paying more for beef purchased directly from Defendants and their co-conspirators than they would have paid and will pay absent the Conspiracy.

191. The alleged contract, combination, understanding, agreement, or conspiracy is a per se violation of the federal antitrust laws.

192. Olean and other members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged.

## XII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff Olean, on behalf of itself and other members of the DPP Class, requests that the Court grant the following relief:

A. Determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Olean as Class representative and its counsel of record as Class counsel, and direct that notice of

this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the DPP Class, once certified;

B.      Adjudge that the Conspiracy, and the acts done by Defendants and their co-conspirators in furtherance thereof, violate Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      Enter judgment for Plaintiff and members of the DPP Class against Defendants for three times the amount of damages sustained by Olean and other members of the Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

D.      Award Plaintiff and the members of the DPP Class pre-judgment and post-judgment interest at the highest legal rate from commencement of this proceeding, to the extent allowed by law;

E.      Permanently enjoin Defendants and their co-conspirators, their respective affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, and from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of the antitrust laws; and

68

F.     Award such other and further relief as the Court may deem just and proper under the circumstances.

## XIII.  JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  July 17, 2020

Respectfully submitted,

*/s/ Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#0388166)
Joshua J. Rissman (#0391500)
Brittany N. Resch (#397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Dennis J. Stewart (*pro hac vice forthcoming*)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dstewart@gustafsongluek.com

Adam J. Zapala (*pro hac vice forthcoming*)
Alexander E. Barnett (*pro hac vice forthcoming*)

69

James G.B. Dallal (*pro hac vice forthcoming*)
Tamarah P. Prevost (*pro hac vice forthcoming*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com
abarnett@cpmlegal.com
jdallal@cpmlegal.com
tprevost@cpmlegal.com

Arthur N. Bailey (*pro hac vice forthcoming*)
**RUPP, BAASE, PFALZGRAF
CUNNINGHAM LLC**
111 West 2nd Street #1100
Jamestown, New York 14701
T: (716) 664-2967
bailey@ruppbaase.com

Marco Cercone, Esq. (*pro hac vice
forthcoming*)
**RUPP, BAASE, PFALZGRAF
CUNNINGHAM LLC**
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Tel: (716) 854-3400
cercone@ruppbaase.com

***Counsel to Olean Wholesale Grocery
Cooperative, Inc. and the Putative Direct
Purchaser Class***

Kevin Landau (*pro hac vice
forthcoming*)
Evan Rosin (*pro hac vice
forthcoming*)
**TAUS, CEBULASH & LANDAU,
LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel: (646) 873-7654
Fax: (212) 931-0703

Kenneth A. Wexler (*pro hac vice
forthcoming*)
Melinda J. Morales (*pro hac vice
forthcoming*)
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel:(312) 346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com

klandau@tcllaw.com
erosin@tcllaw.com

R. Alexander Saveri (*pro hac vice forthcoming*)
Cadio Zirpoli (*pro hac vice forthcoming*)
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
rick@saveri.com
cadio@saveri.com

Simon B. Paris (*pro hac vice forthcoming*)
Patrick Howard (*pro hac vice forthcoming*)
Charles J. Kocher (*pro hac vice forthcoming*)
**SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.C**.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: (215) 496-8282
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com
ckocher@smbb.com

Dianne M. Nast (*pro hac vice forthcoming*)
Daniel N. Gallucci (*pro hac vice forthcoming*)
Joseph N. Roda (*pro hac vice forthcoming*)
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com

Brian D. Penny (*pro hac vice forthcoming*)
**GOLDMAN SCARLATO & PENNY, P.C.**
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel.: (484) 342-0700
Fax: (484) 580-8747
penny@lawgsp.com

J. Gordon Rudd, Jr. (#222082)
David M. Cialkowski (#306526)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 341-0400
gordon.rudd@zimmreed.com
david.cialkowski@zimmreed.com

Joseph Goldberg (*pro hac vice forthcoming*)
Vince Ward (*pro hac vice forthcoming*)
**Freedman Boyd Hollander Goldberg
Urias & Ward P.A.**
20 First Plaza, Suite 700
Albuquerque, NM  87102
Tel : 1.505.244.7520
jg@fbdlaw.com
vjw@fbdlaw.com

Richard M. Hagstrom (#0039445)
Michael R. Cashman (#0206945)
Nathan D. Prosser (#0329745)
Anne T. Regan (#0333852)
**HELLMUTH & JOHNSON, PLLC**
8050 West 78th Street
Edina MN 55439
Telephone: (952) 941-4005
rhagstrom@hjlawfirm.com
mcashman@hjlawfirm.com
nprosser@hjlawfirm.com
aregan@hjlawfirm.com

dgallucci@nastlaw.com
jnroda@nastlaw.com

Warren T. Burns (*pro hac vice*
*forthcoming*)
Will Thompson (*pro hac vice*
*forthcoming*)
Mallory Biblo (*pro hac vice*
*forthcoming*)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
wburns@burnscharest.com
wthompson@burnscharest.com
mbiblo@burnscharest.com

Christopher J. Cormier (*pro hac vice*
*forthcoming)*
**BURNS CHAREST LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com

*Additional Counsel to the Putative Direct Purchaser Class*